UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **MALIBU CONSULTING CORP.,** )<br>)<br>**Plaintiff,** )<br>)<br>VS. )<br>)<br>**FUNAIR CORPORATION,** )<br>)<br>**Defendant.** )<br>) | Civil Action No.  SA-06-CV-735-XR |

**ORDER**

On this date, the Court considered Defendant Funair Corporation's motion for protective order.  For the reasons discussed below, the motion is DENIED (Docket No. 20).  Plaintiff Malibu Consulting Corporation's emergency request for a hearing is DISMISSED AS MOOT (Docket No. 22).

**I. Factual & Procedural Background**

On August 25, 2006, Defendant Funair Corporation ("Funair") removed this case on the basis of diversity of citizenship.  Plaintiff Malibu Consulting Corporation ("Malibu") filed on opposed motion to remand on September 22, 2006, and Funair responded by filing a motion to amend/correct its original notice of removal on October 2, 2006 and a response to the motion to remand on October 3, 2006.  On October 10, 2006, Malibu filed an advisory to the Court stating that Malibu would not oppose Funair's motion to amend and that Malibu is withdrawing its motion to remand.  On October 17, 2006, this Court issued an Order dismissing Malibu's motion to remand as moot and granting Funair's unopposed motion to amend notice of removal.  The Court allowed Funair to file an amended notice of removal that corrected the defective jurisdictional allegations contained in its

original notice of removal.  The Court entered a Protective Order in this case on November 27, 2006.

Malibu is suing Funair under California law for fraudulent misrepresentation, fraudulent concealment, fraudulent non-disclosure, and negligent misrepresentation.  The controversy centers around Malibu's purchase of a Boeing 727 aircraft ("727") from Funair in 2004.  During the negotiations leading up to Malibu's decision to purchase the 727, Malibu alleges that Funair made false representations regarding the quality of the maintenance on the 727 during its ownership by Funair and failed to disclose material facts about the 727's condition that Funair was required to disclose.  Malibu alleges that Funair expressly and falsely represented that the 727 was as "clean as a whistle" and "run [sic] like a Fortune 500 operation."  Malibu argues that these representations were material and relied upon by Malibu in its decision to purchase the 727.  Malibu alleges that Funair, acting through its agents and representatives, knew, or in the exercise of reasonable care should have known, that these representations about the quality and condition of the aircraft were false.  Malibu contends that Funair performed illegal repairs on the 727 and that the aircraft was struck by lightning on at least one occasion.  In failing to disclose this information, Malibu argues that Funair committed actionable fraud.

Malibu hired Aero Sky, L.L.C. ("Aero Sky") to perform a pre-purchase inspection of the 727. Aero Sky performed the pre-purchase inspection in April and May of 2004 at its facility in San Antonio, Texas.  During the inspection, Malibu alleges that Funair's representative would not allow Aero Sky to open some panels on the 727, which prevented Aero Sky and Malibu from discovering the full extent of the 727's problems. Aero Sky's pre-purchase inspection report stated that repair and maintenance work of approximately $1,000,000 would be necessary in order to bring the 727 to fully operational and airworthy condition.  After receiving this inspection report and relying on Funair's representations, Malibu entered into an Aircraft Purchase Agreement ("APA") with Funair on or

about August 2, 2004. Importantly, the APA states that the contract "shall be governed, interpreted, and construed in accordance with the laws of the State of California, without regard for its conflict of laws provisions."

After the purchase was complete, Aero Sky began to repair the 727. Malibu alleges that Aero Sky discovered corrosion and other damage that was far more extensive than represented by Funair and far more extensive than was evident from the incomplete pre-purchase inspection report. Malibu contends that it has paid substantial sums for repairs to the 727, which far exceeded the $1,000,000 estimate contained in the inspection report. Malibu also argues that it was forced to spend a significant amount of money for substitute air transportation while waiting for the 727 to be repaired.

Regarding damages, Malibu claims that under California law, it is entitled to recover the difference between the $1,000,000 that it paid for the 727 and the market value of the 727 at the time of purchase. Malibu also seeks all amount actually and reasonably expended by Malibu in reliance upon Funair's fraud, an amount that would compensate Malibu for its loss of use and enjoyment of the 727 to the extent that such loss was caused by Funair's fraud, incidental and consequential damages resulting from the fraud, and punitive damages.

On January 10, 2007, Funair filed a motion for protective order, which would limit the scope of several Rule 30(b)(6) deposition notices. Malibu responded to the motion on January 16, 2007, and it requested the Court to either rule on the motion or hold an emergency hearing before January 22, 2007, which is the first day of the scheduled deposition.

Plaintiff Malibu seeks to discover evidence produced during a previous arbitration proceeding between Funair and Raytheon Company ("Raytheon"). Prior to Funair selling the 727 to Malibu, a Boeing Business Jet ("BBJ") owned by Funair was the subject of litigation between Funair and Raytheon in the United States District Court for the Southern District of Florida, Miami

Division. Funair had contracted with Raytheon to complete the interior of the BBJ that Funair had recently purchased, and Raytheon apparently did not perform this work in a timely manner and in accordance with the contractual requirements. That case was eventually arbitrated due to the existence of a contractual arbitration provision. As part of that arbitration, the parties engaged in open discovery, which was subject to a protective order signed by both parties. According to public documents filed in the Raytheon litigation, the 727 was used by Funair as a substitute aircraft for the BBJ during the excessive period it allegedly took Raytheon to perform work on the BBJ. Funair alleged in the arbitration proceeding that it used the 727 as a substitute aircraft for the BBJ, and Funair accordingly claimed damages (1) for loss of use while Funair used the 727 as a substitute aircraft for its non-accessible BBJ, and (2) for diminution in market value of the 727 when it was used as a substitute aircraft. The arbitrator found that Funair mitigated its loss of use damages by continuing to operate the 727, but Funair experienced operating costs with the 727 that exceeded the cost of operating the BBJ that was not available due to significant delays in work that Raytheon was hired to perform on the BBJ. The arbitrator also found that the 727 declined in market value during the lost use periods in which it was operated in mitigation of Funair's lost use damages. The arbitrator awarded Funair the following sum:

> Funair's mitigation of damages based on "Extra Operating Costs" constitute a per diem cost of $1,141.85 . . . which multiplied by the number of days from July 1, 2001 to February 4, 2004 less the 120 days of liquidated damages equals $944,309.95 plus diminished market value of the 727 aircraft of $2,900,000.00 for total lost use damages after mitigation of $3,844,309.95.

Award of Arbitrator, ¶ 82.

Malibu claims that those categories of damages sought by Funair and awarded by the

arbitrator are relevant to Malibu's allegations and claimed damages in this case. Malibu alleges that the methodology used by Funair in making its loss of use damage claim in the arbitration is relevant to Malibu's damages claims because this case involves a comparison of the cost to operate an owned aircraft (in this case, the 727, and in the Raytheon case, the BBJ) with a substitute aircraft (in this case, the aircraft used by Malibu while awaiting completion of repairs on the 727; and in the Raytheon case, the 727). Malibu argues that it is entitled to discover the reasons for the 727's decline in market value and the amount of that decline, which is relevant to Malibu's allegations and claimed damages in this case. To the extent that Funair's maintenance practices were involved in the Raytheon litigation, Malibu argues that it is entitled to deposition testimony on that topic.

In addition to arguing that the requested documents are relevant, Malibu argues that it has limited the scope of its requests for Raytheon litigation documents to pertinent, non-privileged portions of the files (e.g. expert reports, deposition transcripts, and related documents) concerning the loss of use damages related to the 727, the diminution in value of the 727, and the maintenance performed on the 727. Malibu argues that it is entitled to discover the previous testimony of deponents who testified during the Raytheon litigation concerning these topics. Malibu argues that the protective order only protected confidential information, that it did not survive the termination of the arbitration, that any confidential documents produced in this litigation would be subject to this Court's protective order, and that assertion of a continuing "arbitration privilege" does not trump Funair's responsibility to produce relevant, responsive documents during this litigation.

Malibu served five deposition notices seeking discovery about numerous matters, including the Raytheon litigation. Pursuant to Fed. R. Civ. P. 30(b)(6), one of the deposition notices requested Funair to designate a corporate representative to testify upon matters related to the Raytheon litigation and to produce documents related to the Raytheon litigation. The other four individual

deposition notices requested that those witnesses also produce documentation related to the Raytheon litigation. Funair now seeks a protective order limiting the scope of Malibu's depositions because "some of the subject matter upon which examination is requested and the related documents requested duces tecum contained in Plaintiff's Fed. R. Civ. P. 30(b)(6) notice would require Defendant to violate the protective order entered in a private arbitration proceeding between Funair and another party [Raytheon] which are not relevant to any claim or defense in this lawsuit." Motion for Protective Order, ¶ 7. Funair argues that its "privacy interests include its right to participate freely in private arbitration without fear that the protective order issued by that authority may be rendered a nullity and its right to avoid being compelled to disclose information that potentially makes Funair liable for breach of that underlying agreement." Funair insists that Malibu seek modification with the issuing body [the arbitration panel] rather than compel Funair to breach its agreement in an unrelated action. Funair argues that a party seeking to pierce a protective order must first go to the issuing body to seek modification of the protective order before another court will violate this long-standing principle of comity.

## II. Legal Analysis

Rule 26(c) of the Federal Rules of Civil Procedure states that upon motion by a party "and for good cause shown," the Court may enter a protective order that certain matters not be inquired into, or that the scope of the disclosure or discovery be limited to certain matters. The burden rests with the movant—Funair—to show good cause why it should not have to comply with the requested discovery. *Landry v. Air Line Pilots Ass'n Int'l*, 901 F.2d 404, 435 (5th Cir. 1990).

The Court finds that the arbitral protective order ("APO") does not apply to the discovery sought in this case. First, the APO only protected "confidential information" exchanged between Funair and Raytheon. APO, ¶ 1. According to the APO, the parties shall make their designation of

information as "Confidential Information" by stamping, marking, or otherwise identifying those items deemed to contain trade secret, confidential and proprietary information. APO, ¶ 4. In this case, Funair has failed to demonstrate that any of the documents sought by Malibu were in fact designated as "confidential information" during the arbitration. The APO states that if Funair or Raytheon is served with a demand in another action to produce confidential information, then the party shall object to its production and set forth the existence of the protective order. APO, ¶ 14. However, in this case, Funair bears the burden of demonstrating that Malibu requested information that was designated as "containing trade secret, confidential and propriety information and other business and commercially sensitive information" during the arbitration. APO, ¶ 1. The Court highly doubts that documents relating to Funair's loss of use, diminution in value, and maintenance of the 727 in its custody would constitute trade secret, confidential or proprietary information. Second, the APO states that upon termination of the arbitration, the parties shall return to the producing party or destroy all confidential information exchanged during the course of the arbitration. APO, ¶ 17. Assuming that Funair has complied with this crucial provision of the APO, Funair should only have its own confidential information (not Raytheon's) in its actual or constructive possession. Certainly, Funair could not breach an agreement between it and Raytheon by producing its own confidential information in this litigation. Furthermore, to the extent that Funair is producing its own confidential information in this case, that information is protected by this Court's own Protective Order. Thus, Funair's argument that allowing discovery on these topics would subject it to liability for breach of the APO is unfounded because Funair will not produce any of Raytheon's confidential information in this litigation. The Court agrees with Malibu's argument that "it is inconceivable that Funair would be in breach of the protective order [APO] by producing documents related to *Funair's own* damage claims and *Funair's own* maintenance policies and practices concerning the 727 aircraft."

Response to Motion for Protective Order, Pg. 9. Finally, paragraph seventeen of the APO strongly suggests that the APO does not even survive the termination of the arbitration because any confidential information produced by an opposing party during the arbitration must be returned to that party.

The Court need not resolve the issue of whether a party seeking to pierce a protective order must first go to the issuing body to seek modification of the protective order because the Court has determined that the APO, even if it did survive the termination of the arbitration, does not protect the information sought by Malibu in this case.

### III. Conclusion

The Court determines that the discovery sought by Malibu is relevant and that Funair has not shown good cause for the issuance of a protective order. Therefore, the motion for protective order is DENIED (Docket No. 20). Plaintiff Malibu Consulting Corporation's emergency request for a hearing is DISMISSED AS MOOT (Docket No. 22). Malibu may obtain discovery on the information discussed in this Order.

It is so ORDERED.

SIGNED this 18th day of January, 2007.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE